# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KEITH L. MOORE, )
        Plaintiff )
            v. ) 2:09cv1317
) **Electronic Filing**
MICHAEL J. ASTRUE, )
Commissioner of Social Security, )
        Defendant )

## MEMORANDUM OPINION

September 17, 2010

**I.**     **INTRODUCTION**

Keith L. Moore ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381 - 1383f ("Act"). This matter comes before the Court on cross motions for summary judgment filed by the parties pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. Nos. 7, 10). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment will be DENIED; Defendant's Motion for Summary Judgment will be GRANTED; and, the decision of the Administrative Law Judge, David Hatfield ("ALJ"), will be AFFIRMED.

**II.**     **PROCEDURAL HISTORY**

Plaintiff filed for DIB and SSI with the Social Security Administration ("SSA") on May 23, 2005, claiming an inability to work due to disability as of May 1, 2003. (R. at 53 - 55, 553 -

58).[1]  Plaintiff was initially denied benefits by the SSA on September 23, 2005. (R. at 49 - 52). Plaintiff filed a request for a hearing before an administrative law judge on November 21, 2005. (R. at 33).  A hearing was held on May 21, 2007, at which Plaintiff , represented by counsel, testified before the ALJ. (R. at 26, 624).  A vocational expert, Karen Krull, also testified. (R. at 624).  The ALJ issued his decision denying benefits to Plaintiff on July 19, 2007. (R. at 14 - 25). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on July 31, 2009, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 6 - 8).

Plaintiff filed his Complaint in this Court seeking review of the ALJ's decision on October 7, 2009.  Defendant filed his Answer on December 11, 2009.   Cross motions for summary judgment followed.

### III.     STATEMENT OF THE CASE

Plaintiff was born December 19, 1961, and was forty five years of age at the time of his administrative hearing. (R. at 628).  He had a high school education, and had served in the United States Army as a heavy equipment operator for a little over three years. (R. at 631).  Plaintiff was residing with his mother, as he had been during the disputed period of disability, and was unemployed. (R. at 629).  Plaintiff received medical benefits from the Commonwealth of Pennsylvania. (R. at 630).

Plaintiff's work history included a stint as a maintenance man at a local foundry from 1990 until 1996. (R. at 64).  The job required technical knowledge and the use of machines, tools, and other equipment. (R. at 65).  Plaintiff was typically on his feet for eight hours a day, and frequently walked, climbed, stooped, crouched, handled large and small objects, and lifted up to fifty pounds at a time. (R. at 65).  From August of 1997 until September of 2003, Plaintiff worked as a detailer at a car dealership. (R. at 64).  Detailing required technical knowledge and

---

[1]   Citations to Doc. Nos. 5 - 5-2, the Record, *hereinafter*, "R. at __."

the use of machines, tools, and other equipment. (R. at 79). Plaintiff walked approximately eight hours a day, frequently stooping, reaching, and handling objects. (R. at 79). Plaintiff typically lifted between ten and fifteen pounds when carrying five gallon water buckets. (R. at 79). Finally, from July of 2004 until October of 2004, Plaintiff worked as a packer at a paper supply company. (R. at 64). There Plaintiff counted and wrapped paper, and stacked the paper on shelves. (R. at 81). Plaintiff was on his feet for approximately eight hours a day, and had to write, type, or handle small objects. (R. at 81). Plaintiff frequently lifted ten pounds everyday when stacking paper. (R. at 81).

Plaintiff sustained a right knee injury while wrestling in 1981. (R. at 176). Despite an early surgery, the condition of Plaintiff's right knee continued to worsen over the years. By the time of the administrative hearing, Plaintiff claimed he was unable to use stairs without a railing, and could not walk more than one hundred yards without cramping and weakness in his knee. (R. at 89). Plaintiff claimed he could sit for approximately fifteen minutes before he had to stand due to numbness and muscle spasms in his leg. (R. at 89). Plaintiff claimed he could carry up to twenty pounds, but not far, due to weakness. (R. at 89). Plaintiff needed to plan ahead to take the easiest path available when walking. (R. at 91).

Medical records indicated that as early as December 20, 2001, Plaintiff was diagnosed with severe degenerative joint disease, and was a candidate for knee replacement. (R. at 176). Plaintiff exhibited weakness in the right foot and numbness. (R. at 176). His knee had significant bony prominences and a trace effusion. (R. at 176). The knee did not fully extend, and Plaintiff experienced painful patellofemoral grind. (R. at 176). An x-ray showed marked medial compartmental disease and some patellofemoral disease. (R. at 176). A knee replacement was not considered an option at the time due to Plaintiff's age; instead, Plaintiff received injections to relieve pain and a knee brace for support. (R. at 176). Plaintiff's right leg was tested for vascular disorders November 1, 2001, due to the presence of swelling and pain. (R. at 187). No vascular causes were found. (R. at 187). Further examinations in 2002 yielded similar results indicating severe degeneration of the right knee. (R. at 175, 184 - 86).

Plaintiff began seeing Leonard B. Zadecky, M.D. on March 5, 2004. (R. at 123). Plaintiff

was observed wearing a brace on his right knee, and walking with a limp as a result of Plaintiff locking his right knee to maintain stability. (R. at 123). Dr. Zadecky noted that Plaintiff also had a former problem with alcohol abuse, a continuing smoking habit, and problematic hypertension. (R. at 123). At a follow-up appointment several days later, Dr. Zadecky reviewed a magnetic resonance image ("MRI") of Plaintiff's right knee, and noted severe degenerative changes in the medial and lateral joint spaces, moderate narrowing of the patellofemoral joint, subluxation of the tibia in relation to the distal femur, and multiple calcified loose bodies in the joint space. (R. at 122). There was also evidence of chronic tearing of the anterior cruciate ligament, and tears in the medial meniscus, and anterior and posterior horns of the lateral meniscus. (R. at 122). Knee replacement was thought to be Plaintiff's best option, despite his young age. (R. at 121).

Peter Tang, M.D. examined Plaintiff on May 13, 2004, and noted that x-rays of Plaintiff's left knee showed severe osteoarthritis and soft tissue calcification consistent with synovial chondromatosis. Plaintiff exhibited tricompartmental arthritis, and was bone on bone in the medial compartment of the right knee. (R. at 119). An MRI confirmed the x-ray findings. (R. at 119). Dr. Tang noted that Plaintiff would have to endure the pain with more conservative treatments until an eventual total knee replacement. (R. at 119).

Plaintiff was noted as walking with a bad limp by Dr. Zadecky on July 8, 2004. (R. at 117). Plaintiff's swelling of the right knee had decreased since he began using the brace and received steroid injections. (R. at 117). Knee replacement, while still the best treatment for Plaintiff's condition, was still being put off because of his young age. (R. at 117).

Throughout the course of his treatment by Dr. Zadecky and other physicians for knee pain, objective medical findings remained largely unchanged. (R. at 211, 295 - 97, 324 - 33, 397 - 404). However, Plaintiff maintained that, while wearing his knee brace, he had not fallen and was relatively stable. (R. at 296). By May 23, 2006, Plaintiff was determined by orthopedic doctor Adam Shimer, M.D. to have end-stage tricompartmental disease, with chronic instability and unrelenting pain. (R. at 535). Dr. Shimer's review of an MRI of Plaintiff's right knee on June 27, 2006, showed a chronically posteriorly subluxed femur and "horrible" tricompartmental arthritis with a large number of osteophytes and loose bodies in the posterior knee. (R. at 526).

Plaintiff finally had the knee replacement. (R. at 523 - 25). Victor Prisk, M.D. performed a right total knee arthroplasty on July 28, 2006. (R. at 543 - 50). By August 4, 2006, Plaintiff was able to walk with the assistance of a walker. (R. at 416). Plaintiff was discharged the same day. (R. at 372). Plaintiff was allowed to do weight bearing, as tolerated, and was to avoid heavy lifting. (R. at 374). Twelve days following his surgery, Plaintiff was noted as doing very well. (R. at 414). By September 21, 2006, Plaintiff was able to ambulate without pain, his pain in general was minimal, and he intended to return to work the following day. (R. at 412).

In August of 1993, Plaintiff was found to have a torn rotator cuff in his right shoulder as a result of a motorcycle accident. (R. at 143, 179). He had significant pain, and was unable to actively flex or abduct his shoulder. (R. at 180). Plaintiff's shoulder was surgically repaired that September. (R. at 181). Even after the surgery, however, Plaintiff experienced pain and inability to fully use his right shoulder. (R. at 178). In December of 1993, Plaintiff was instructed that he was not to lift more than ten pounds, and that he was not to lift objects above his waist. (R. at 178). By January of 1994, Plaintiff was informed by his treating physician that despite continuing difficulty with his right shoulder, he was released to do all types of lifting. (R. at 177). In June of 1994, Plaintiff's right shoulder strength was much improved and he requested to be returned to unrestricted duty at his place of employment. (R. at 177). An x-ray of Plaintiff's right shoulder July 15, 2004 revealed that there were degenerative changes, and a fracture to the distal clavicle. (R. at 137). No limitations were noted by the examining physician. (R. at 137).

A number of functional assessments were completed regarding Plaintiff's knee and shoulder conditions. On February 2, 2006, Plaintiff's treating physician, Dr. Zadecky, completed a form for the Pennsylvania Department of Public Welfare. (R. at 170). On the form, Dr. Zadecky indicated that as a result of the instability of Plaintiff's knee, Plaintiff was unable to carry anything of significant weight. (R. at 170). Moreover, Plaintiff could not walk on uneven surfaces, climb ladders, or walk significant distances. (R. at 170).

On August 9, 2005, Samuel I. Han, M.D. also performed a functionality assessment when Plaintiff sought benefits from the state. Dr. Han determined that Plaintiff could stand and walk with the use of a knee brace. (R. at 146). Plaintiff could frequently lift and carry up to twenty

5

pounds, and could occasionally lift and carry up to twenty-five pounds. (R. at 147). Plaintiff could stand and walk for one to two hours of an eight hour workday, and could sit for eight hours. (R. at 147). Plaintiff was unable to crouch or climb, and could only occasionally bend, kneel, stoop, and balance. (R. at 148). Plaintiff was to avoid heights, moving, vibration, and wetness. (R. at 148).

Finally, consultant Mary DiMartino performed a physical residual functional capacity assessment ("RFC") on September 19, 2005. (R. at 164 - 69). Ms. DiMartino concluded that Plaintiff could frequently lift less than ten pounds, and occasionally lift ten pounds. (R. at 165). Plaintiff could stand and walk for at least two hours of an eight hour workday, and could sit about six hours. (R. at 165). Plaintiff was not found to be otherwise limited. (R. at 164 - 69). In coming to her conclusion, Ms. DiMartino adopted Dr. Han's assessment of Plaintiff. (R. at 169).

Plaintiff testified that during his claimed period of disability, while he retained the ability to drive and did so relatively frequently, he was often limited by swelling in his left knee and leg that decreased his reaction time with the car's pedals. (R. at 630). As a result, Plaintiff did not feel safe driving a vehicle. (R. at 630). His knee often swelled to the point that it was difficult for him to walk. (R. at 631).

During his alleged period of disability, Plaintiff stated that his right knee was extremely unstable and dislocated frequently. (R. at 637). He had to wear the brace constantly in order to walk. (R. at 638). Unless Plaintiff wore a brace on his right knee throughout the day, his knee would not move properly. (R. at 646 - 47, 649). Despite the severity of his knee condition, Plaintiff testified that his doctors were reluctant to operate, because he was still fairly young. (R. at 638). Plaintiff experienced much difficulty when walking, particularly on uneven ground. (R. at 638 - 39). He fell easily, and though he did not use a cane or other assistive device to walk, Plaintiff tried to make sure that wherever he was going, there was a handrail or something of that nature that he could use to stabilize himself while walking. (R. at 638 - 39). Plaintiff could not use stairs without a handrail.

Plaintiff testified that he experienced difficulty sleeping because of his knee pain. (R. at 641). However, Plaintiff did not take pain medications because he claimed they were not

6

providing him with relief. (R. at 642). Plaintiff further testified that he had stopped taking Aleve for pain because it affected his kidney functioning. (R. at 642). Plaintiff's doctors prescribed no exercises or therapy to relieve his pain. (R. at 642).

Prior to his period of alleged disability, Plaintiff worked in maintenance at a local foundry. (R. at 632). There, he took care of the machinery - wrenching, lifting, and replacing bearings on the machines. (R. at 632). Plaintiff testified that he was typically on his feet, sitting very little during the workday, and did moderate lifting and bending. (R. at 632). Plaintiff was terminated at the foundry for alcohol abuse-related issues. (R. at 632). Following that job, Plaintiff worked as an auto detailer. He was primarily on his feet washing cars until he quit in September of 2003, again because of alcohol abuse-related issues. (R. at 633). Plaintiff testified that in December of 2003 he stopped drinking alcohol, and has been sober since that time. (R. at 634).

Between July 22, 2004 and September 18, 2004, Plaintiff testified that he worked as a packager at a paper plant. (R. at 635). The job entailed standing most of the day, sorting paper, and lifting boxes onto shelves, though he stated that shoulder problems forced him to ask others for help with some higher lifting. (R. at 637). Plaintiff would typically lift ten to fifteen pounds at a time. (R. at 635).

On several occasions each year during the alleged period of Plaintiff's disability, he contends that he helped friends with carpentry and roofing work. (R. at 639 - 40). These jobs occasionally lasted a week, depending on the weather, but Plaintiff did not work five days a week or eight hours a day when completing these jobs. (R. at 640). He was relegated to fairly basic tasks such as cutting wood. (R. at 640). Plaintiff testified that he made just enough money on these jobs to get by, but was otherwise dependant upon his mother for support. (R. at 640, 629).

In terms of helping around the house, Plaintiff stated that he did some vacuuming and dusting because he and his mother lived in a mobile home and there was not much to clean. (R. at 641). Plaintiff would also go to a small, local grocery store to get basic necessities. For more substantial shopping, Plaintiff's sister would shop for him and his mother. (R. at 643).

7

Plaintiff testified that he enjoys hunting, but during his period of disability he was limited to walking down the road to a strip mine, sitting on a bucket near the woods and waiting for game. (R. at 643). His knee condition made it impossible for him to enter the woods to hunt. (R. at 643). Outside of seeing his friends, Plaintiff testified that he stayed at home. He did not go to church, the movies, or restaurants. (R. at 644). During the day, he typically elevated his right leg and watched television. (R. at 645 - 47). Plaintiff elevated his leg for about three quarters of the day, or his right knee would become severely swollen, making his leg stiff and numb. (R. at 645 - 48). Plaintiff then had to spend time on his feet in order to get feeling back in his leg. (R. at 645 - 48). Regular sitting caused Plaintiff constant aggravation of his right knee. (R. at 645 - 48). Plaintiff further testified that the swelling could often be unpredictable when walking or sitting. (R. at 648).

The ALJ asked Plaintiff if he felt that he would have been able to perform a job during his period of disability wherein he sat most of the day, could move around and stretch occasionally, would not need to lift heavy objects, and worked on an assembly line. (R. at 644). Plaintiff felt that this would have been possible. (R. at 644). However, Plaintiff later testified that having to stand up and sit down frequently to relieve the swelling in his right knee could become painful and irritating over an eight hour period. (R. at 648).

Following Plaintiff's testimony, the ALJ questioned the vocational expert, Karen Krull. The ALJ asked Ms. Krull what jobs would be available in significant numbers in the national economy to a hypothetical person of Plaintiff's age, education, and work experience, and with the following limitations: sedentary work involving sitting, but with the ability to stand every thirty minutes; no crouching or climbing on the job; no heights or moving machinery on the job; and, no excessive vibration or wetness on the job. (R. at 653).

Ms. Krull testified that a number of jobs would be available to the hypothetical person: "assembler," of which there were 161,000 jobs in the national economy; "alarm monitor," of which there were 75,000 jobs in the national economy; and, "cashier," of which there were 648,000 jobs in the national economy. (R. at 653). The ALJ asked if these jobs would still be available if the hypothetical person also had to elevate his or her leg at about waist-height for

approximately one third of the work day. (R. at 654). Ms. Krull responded that no jobs would be available to the hypothetical person in such a case. (R. at 654). Jobs may be available if the hypothetical person limited the leg elevation to the three breaks a day typically allotted to workers in the identified positions. (R. at 654).

In his decision dated July 19, 2007, the ALJ made the following findings:

1. The [Plaintiff] meets the insured status requirements of the Social Security Act through September 30, 2008;
2. The [Plaintiff] has not engaged in substantial gainful activity since May 1, 2003, the alleged onset date;
3. The [Plaintiff] has the following severe impairments: rotator cuff injury to the right shoulder and osteoarthritic synovial chondromatosis of the right knee;
4. The [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;
5. After careful consideration of the entire record, I find that the [Plaintiff] has the residual functional capacity to perform sedentary work. The [Plaintiff] can carry and lift ten pounds, sit for six hours during an eight hour day and stand and walk for at least two hours during an eight hour work day. The [Plaintiff] needs a sit/stand option allowing him to change position every thirty minutes. The [Plaintiff] can do no crouching or climbing and needs to avoid heights and moving machinery. The [Plaintiff] should avoid vibrations and excessive wetness;
6. The [Plaintiff] is unable to perform any past relevant work;
7. The [Plaintiff] was born on December 19, 1961 and was 41 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date;
8. The [Plaintiff] has at least a high school education and is able to communicate in English;
9. Transferability of jobs skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [Plaintiff] is "not disabled," whether or not the [Plaintiff] has transferable job skills;
10. Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform; and,
11. The [Plaintiff] has not been under a disability, as defined in the Social Security Act, from May 1, 2003 through September 21, 2006.

(R. at 19 - 25). Accordingly, the ALJ found Plaintiff was not entitled to DIB and SSI. (R. at 25).

## IV. STANDARD OF REVIEW

Judicial review of the Commissioner's final decisions on disability claims is provided by

statute. 42 U.S.C. §§ 405(g)[2] and 1383(c)(3).[3] Section 405(g) permits a district court to review transcripts and records upon which a determination of the Commissioner is based. When reviewing a decision, the district court's role is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact. *Burns,* 312 F.3d at 118. Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review

---

[2]

Section 405(g) provides in pertinent part:
> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[3]

Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

the record as a whole. *See* 5 U.S.C. §706.

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). The ALJ must utilize a five-step sequential analysis when evaluating the disability status of each claimant. 20 C.F.R. §404.1520. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., pt. 404 subpt. P., appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given plaintiffs's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

V.   DISCUSSION

Plaintiff first attacks the decision of the ALJ by claiming that the ALJ failed to properly discuss those factors that justified his determination that Plaintiff's knee condition did not meet the requirements for a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1, 1.02. (Doc. No. 8 at 10). Defendant argues Plaintiff failed to show an "inability to ambulate effectively," and therefore did not meet the requirements for automatic disability under 1.02. (Doc. No. 11 at 13 - 14).

20 C.F.R. Part 404, Subpart P, Appendix 1, 1.00, describes disorders of the

musculoskeletal system and the requirements that a claimant must meet to be considered automatically disabled under 1.00. Specifically 1.02, "Major dysfunction of a joint(s) (due to any cause)," mandates an impairment be:

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

"Inability to ambulate effectively" is defined as:

> . . . an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)
> . . .
> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Part 404, Subpart P, Appendix 1, 1.00B2b.

The Court of Appeals for the Third Circuit has had cause to visit the issue of the adequacy of an ALJ explanation of a claimant's failure to meet listing requirements at Step 3. In *Scuderi v. Comm'r of Soc. Sec.*, 302 Fed. Appx. 88 (3d. Cir. 2008), the Court held that an ALJ must provide a sufficient explanation of his determination in order for a court to engage in meaningful review. *Id.* at 90 (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000)). However, it has also been held that the ALJ need not adhere to a particular format

when providing the required explanation. *Id.* (Quoting *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004)). "The ALJ need not specifically mention any of the listed impairments in order to make a judicially reviewable finding, provided that the ALJ's decision clearly analyzes and evaluates the relevant medical evidence as it relates to the Listing requirements" at some point in his or her decision. *Id.*

In his decision, the ALJ cited Dr. Zadecky's findings that Plaintiff could not climb ladders, could not walk sustained distances, could not carry anything of significant weight, and could not walk on uneven surfaces because of his right knee. (R. at 22 - 23). The ALJ also cited Plaintiff's complaints to his doctors regarding the limitations his right knee condition imposed on his daily activities. (R. at 21 - 23). However, the ALJ found this evidence to be unpersuasive. During the alleged period of Plaintiff's disability, Plaintiff testified that he continued to intermittently work as a carpenter and as a roofer. (R. at 21-23). Plaintiff also testified that he worked a full-time job as a packer in a paper production facility and as a car detailer. (R. at 21-23). These occupations required Plaintiff to stand for extended periods, walk, lift, and climb. (R. at 21-23). The Plaintiff testified that he went hunting for deer during his alleged period of disability, an activity requiring him to walk out into a strip mine to sit and wait for game. (R. at 21-23). During his alleged period of disability, Plaintiff only ceased working because he either voluntarily quit or the job ended. (R. at 21-23).

Plaintiff's admitted activities contradict his assertion that he was unable to ambulate effectively. Similarly, in *Morrison v. Comm'r of Soc. Sec.*, 268 Fed. Appx. 186 (3d. Cir. 2008), a child claimant suffering from a painful bone disorder leaving him with a limp was considered able to ambulate effectively because he would walk home from school and participate in gym class. *Id.* at 189. Additionally, other than wearing a knee brace, there is no objective evidence showing that Plaintiff required any hand-held assistive devices to walk. In *Schettino v. Comm'r of Soc. Sec.*, 295 Fed. Appx. 543 (3d. Cir. 2008), an obese claimant with knee and back problems, and non-Hodgkin's Lymphoma was considered able to ambulate effectively because he did not require an assistive device to walk. *Id.* at 545. In light of the significant evidence of Plaintiff's daily activities contradicting Plaintiff's claim of inability to ambulate effectively, and

13

objective evidence pointing to his ability to walk without the assistance of a hand-held device, the ALJ's conclusion that Plaintiff did not meet impairment listing 1.02 was supported by substantial evidence.

Plaintiff next argues that his RFC assessment and hypothetical failed to account for his inability to sit for long periods due to swelling of his right leg, and a significant restriction in his right shoulder because of the torn rotator cuff. (Doc. No. 8 at 14). Plaintiff contends that the ALJ allegedly ignored the findings of Dr. Zadecky and improperly disregarded a portion of the vocational expert's testimony. (Doc. No. 8 at 15-17). Defendant argues that Plaintiff's credibly established functional limitations were fully accounted for in the ALJ's RFC assessment, and that the conclusions of Plaintiff's treating physicians and consultant's assessments provide the substantial evidence necessary to support the ALJ's conclusions. (Doc. No. 11 at 8-13).

Generally, "'residual functional capacity'[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)). In determining a claimant's RFC, an administrative law judge must consider all evidence of record and the claimant's subjective complaints and statements concerning his limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a), and 416.920. However, the determination of disabled status for purposes of receiving DIB or SSI will not be affected by a medical source simply because it states that a claimant is "disabled," or "unable to work." 20 C.F.R. § 404.1527(e), 416.927(e).

With respect to hypothetical questions posed to vocational experts, "the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual . . . impairments." *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002) (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)). To be considered substantial evidence, the vocational expert's testimony must have been based upon a hypothetical reflecting all medically undisputed evidence of impairment. *Id.* The hypothetical must only specify impairments supported by the record. *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d. Cir.

1987).

Neither Dr. Zadecky, Dr. Han, nor Ms. DiMartino found Plaintiff to be limited with respect to his ability to sit and perform work for extended periods. (R. at 21-23). Ms. DiMartino concluded that Plaintiff could sit approximately six hours of an eight hour workday, and Dr. Han concluded that Plaintiff could sit eight hours if allowed to alternate between sitting and standing. (R. at 21-23). Dr. Zadecky made no limitation finding with regarding an inability to sit due to right leg swelling. (R. at 21-23). He also made no limitations findings with respect to Plaintiff's rotator cuff injury. (R. at 21-23). Ms. DiMartino concluded that Plaintiff could frequently lift less than ten pounds. (R. at 21-23). Dr. Han determined that though Plaintiff had difficulty with elevation and abduction of the right shoulder, he was still capable of frequently lifting and carrying up to twenty pounds. (R. at 21-23). When asked by the ALJ at his hearing whether Plaintiff could have worked in a sedentary position during his period of alleged disability, Plaintiff replied in the affirmative, qualifying his response later, but never retracting it. (R. at 21-23). Plaintiff had no difficulty working as a paper packer, except when lifting paper to an unspecified height. (R. at 21-23). He also had no difficulty walking down a road into a strip mine to sit on a bucket and hunt deer. (R. at 21-23).

There is no indication that if the ALJ had added to his list of limitations that Plaintiff could not lift his right arm above his shoulder, that Plaintiff would have been excluded from the job of assembler, alarm monitor, or cashier. Moreover, there was no medically undisputed objective evidence provided by Plaintiff's physicians or consultants that Plaintiff was limited by an inability to lift his right arm above shoulder level during the alleged period of disability. Lastly, there was no medically undisputed evidence provided by Plaintiff's physicians or consultants that Plaintiff was limited because of swelling in his leg, and the ALJ was therefore justified in not including that portion of the vocational expert's testimony in his final RFC assessment. Thus, there is no evidence that Plaintiff's impairments were not fully accommodated by the ALJ's hypothetical and RFC assessment. The ALJ's decision was therefore supported by substantial evidence.

**VI.	CONCLUSION**

Based upon the foregoing, Plaintiff's Motion for Summary Judgment will be denied, Defendant's Motion for Summary Judgment will be granted, and the decision of the ALJ will be affirmed.  An appropriate Order follows.

s/ David Stewart Cercone  
Davis Stewart Cercone  
United States District Judge

cc:	Christine M. Nebel  
220 South Washington Street  
Butler, PA 16001

Lee Karl  
Assistant United States Attorney